THE STATE ex rel. MISSOURI GAS & ELECTRIC SERVICE COMPANY v. FRANCIS H. TRIMBLE et al., Judges of Kansas City Court of Appeals.

Division Two, April 9, 1925.

1. **CERTIORARI: To Court of Appeals: Printing Entire Record.** In a *certiorari* to a court of appeals, based on an allegation that its decision contravenes the decisions of this court, it is unnecessary for relator to print the entire record which was before the court of appeals; the only part of the record that can properly be considered is that pertaining to the question of conflict of opinion.

2. **CONTRACT FOR ELECTRIC SERVICE: Right to Measure: Opinion of Court of Appeals.** The order of the Public Service Commission fixing the rate of charges for electricity furnished to customers by a public service company supersedes all existing contracts, and gives to the service company the right to measure the electricity con-

sumed, independently of any existing contract; and the Court of Appeals in holding that a clause of the order reciting that "the service company may, if it desires, measure the customer's maximum demand, in which case the maximum demand in any month shall be the average number of kilowatts indicated or recorded in the thirty-minute intervals in which the consumption of electricity is greater than in any other thirty-minute intervals in the month" merely gave to the service company the right to contract to measure the maximum demand, and as the customer did not so contract the method of determining the demand charge reverted back to the terms of a prior contract, contravened the decision of this court in State ex rel. Sedalia v. Public Service Commission, 275 Mo. 201.

3. ———: Construction of Statute: Right of Court of Appeals: Certiorari. The opinion of a court of appeals cannot be quashed on the ground that it did not correctly construe a certain statute, where its construction does not conflict with any prior decision of this court. Its opinion can be quashed only when it exceeds its jurisdiction by rendering a decision in conflict with the last controlling decision of this court—which it is constitutionally bound to follow.

4. ———: Increase in Charges by Commission: Without Notice to Consumer: Option to Measure Under Existing Schedule: Statute. This court has never construed paragraph 12 of Section 10478, Revised Statutes 1919, and hence the Court of Appeals in deciding that, under said paragraph, a public utility company was without authority to increase its demand charge for electricity unless an authorizing order had been previously made by the Public Service Commission, and made after notice to customers, who had with it contracts for a less rate, did not contravene the decisions of this court. But notice to the commission is of no importance, and notice to the customer is unnecessary, if the service company, in measuring the actual maximum demand, merely exercised an option it already had under a schedule of rates and charges previously filed with the commission.

5. Negative Proof: Positive Direct Testimony: Not Based on Knowledge: Probative Force: Certiorari. The decisions of this court have not laid down such a sufficiently definite rule on the subject, to authorize the quashing of an opinion of the court of appeals holding that, when a witness testifies to a fact upon his direct examination and then upon cross-examination makes admissions which show that his testimony on direct examination was not based upon knowledge of the facts, such testimony is sufficiently substantial to support a finding in his favor in an action at law.

6. **APPELLATE PRACTICE**: Action at Law: Counterclaim: Substantial Evidence: Reversal with Directions to Enter Judgment for Claimant: Usurpation of Jury's Prerogatives. An appellate court has no authority in an action at law, upon a finding by a review of the evidence that appellant's claim is supported by substantial evidence, to reverse the judgment and remand the cause with directions to the trial court to enter judgment for appellant. Such an order invades the province of the trier of the fact, whose right it is to believe or not believe the evidence, even though it appears to be substantial. A suit by a public service company for electricity furnished to a customer, and his counterclaim for excessive charges paid, are both actions at law, and the burden is on the customer to establish his counterclaim by substantial evidence, and where the judgment of the trial court, sitting as a jury, was against him and he appealed, the decision of the Court of Appeals, holding, after a review of the evidence in support of his counterclaim, that it was substantial, and reversing the judgment and remanding the cause with directions to the trial court to enter judgment in his favor on his counterclaim, is contrary to several decisions of this court and will be quashed upon *certiorari* for the reasons that it is the province of the triers of the fact, either the jury or the court sitting as a jury, to determine the credibility of the witnesses and the weight of the evidence in an action at law, and to believe or disbelieve their testimony, and an appellate court cannot legally usurp their functions. The most that an appellate court can do, under such circumstances, is to reverse the judgment and remand the cause for a new trial.

7. **CERTIORARI**: Unassigned Conflict. Upon *certiorari* to a court of appeals, an apparent conflict in its opinion with the decisions of this court, although not suggested by relator, will be noticed, and if real will require a quashal of the opinion in that respect.

Citations to Headnotes: 1, Certiorari, 11 C. J. 142; 2, 3 and 5, Courts, 15 C. J. 511; 4, Electricity, 20 C. J. 27; 6, Appeal and Error, 4 C. J. 2835; Certiorari, 11 C. J. 344.

## *Certiorari.*

RECORD QUASHED SO FAR AS CONFLICTING.

*Harvey & Bellamy* for relator.

(1) When the Public Service Commission fixed the schedule for wholesale electric rates at Marshall, effec- .

tive May 16, 1915, no notice of the action of said Public
Service Commission was necessary, for the reason that,
prior to that time, as stated in the amended answer, there
had been no such rate on file, and this was, therefore,
not a change in rates, but a new rate. No notice under
any circumstances is required to be given directly to
each consumer, but only a notice by publication. Par.
12, Sec. 10478, R. S. 1919; Marty v. Light & Power Co.,
259 S. W. 793. (2) When the Public Service Commis-
sion fixed the wholesale electric.rate schedule, effective
May 16, 1915, the provisions of said rate schedule auto-
matically superseded the provisions of the contract, in
so far as there was a conflict, and no action was necessary
on the part of relator, said milling company, or any other
of relator's customers, to make said schedule effective.
The clause in the Public Service Commission schedule
providing for a measurement of the maximum demand
had the effect of modifying the contract in reference to
the determination of such maximum demand. State ex
rel. Sedalia v. Public Service Commission, 275 Mo. 201;
City of Fulton v. Public Service Commission, 275 Mo.
67; Kansas City Bolt & Nut Co. v. Power & Light Com-
pany, 275 Mo. 529; City Water Company v. City of Se-
dalia, 288 Mo. 411. (3) In said opinion, it is held that
the evidence of witness Rea, that no measurements of
the maximum demand had ever been made, sustained the
burden of proof and established the illegality of the ex-
cessive demand charge collected, notwithstanding said
witness also testified that he did not know how to measure
the maximum demand, nor the methods used for that
purpose, and would not have known what was being done
if he had seen the maximum demand being measured, and
in this holding said opinion conflicts with Rothwell v.
Jamison, 147 Mo. 601, 608, and Childers v. Pickenpaugh,
219 Mo. 376, 435. (4) When the writ of *certiorari* has
been issued and the case is before the Supreme Court for
determining whether or not there is any conflict between
the opinion under review and the rulings of the Supreme
Court, this court will not confine itself to the sugges-

tions made by relator in its petition for the writ, but will quash the record of the Court of Appeals, if it conflicts with any ruling of this court, whether such conflict has been suggested by relator, by respondent, or discovered by the court itself. State ex rel. v. Ellison, 273 Mo. 228; State ex rel. v. Reynolds, 286 Mo. 123; State ex rel. v. Trimble, 253 S. W. 1016.

*A. F. Rector* and *R. H. Duggins* for respondents.

(1) Under the contract filed with the Public Service Commission and the wholesale rate schedule filed on April 16, 1915, relator contracted, after it had by its experts and engineer determined and filed the rated H. P. of defendant's motors and lights and other apparatus connected, necessary to operate said milling plant at 170 H.P. equal to 127 K.W. and fixed its demand charge at 55 per cent of the equivalent rated H. P. motors, to-wit, 127, and fixed 71 K.W. as the demand charge, or $154.50 per month, as demand and service charge. This contract was based on the wholesale rate schedule filed, and could not be changed by relator without an order of the Public Service Commission after notice to defendants. Sec. 10478, par. 12, R. S. 1919; Wichita Co. v. Industrial Co., 214 Pac. 804; P. U. R. 1923-B, p. 309. (2) The relator rated the H. P. motors at 170 H. P. when it installed the electrical machinery, changing the power from steam to electricity, at 170 H. P. which equals 127 K.W. maximum demand charge. 50 K.W. at $2.25, $112.50; 20 K.W. at $2.00, $40.00, equal to $152.50. And under the contract made, the demand charge 71 K.W. for nearly three years, to be exact thirty-three months, relator determined the demand charge to be 71 K.W., and billed the defendant $154.50 per month. Having for so long a time charged defendant 71 K.W. as its monthly demand charge, the relator is bound by the terms of the contract as interpreted and adopted, and will be held to have so contracted and are bound by the contract as

applied in the premises by the parties to it. The doctrine is well established, that when the parties themselves interpret the contract and its terms, they are bound thereby. (3) There is no evidence that the utility company made any measurement of the demand charge at the time the increase from 71 K.W. to 86 K.W. was made, nor at any time from June 1, 1918, to February 28, 1921. Before any increase in the demand charge could be made, if any could be made under contract, measurement of demand load was required, by the terms of the schedule on file. If by any reasoning the company could increase the demand charge by measuring the maximum demand in any month, to obtain the average kilowatts indicated in any thirty-minute interval in which the consumption of electricity was greater than any other thirty-minute interval in the month, relator was required to make monthly measurement in order to determine the exact amount of the demand charge to be billed against defendant for the month. The evidence is that no measurement was ever made, and the testimony was not questioned or disputed. No measurement having been made, no increase in the demand charge could be made. It was the duty of the utility company, if it had the right to increase the rate, to do so only after actual measurement warranted it, and it was required to measure accurately before increasing the demand charge. Rhodes-Burford H. F. Co., v. Union Elec. L. & P. Co., 2 Mo. P. S. C. p. 666. (4) The amount paid to the relator under protest can be recovered in this action. Brewing Co. v. St. Louis, 187 Mo. 367; Westlake v. St. Louis, 77 Mo. 47.

DAVID E. BLAIR, J.—This is an original proceeding in *certiorari*, wherein relator seeks to quash the opinion and judgment of the Kansas City Court of Appeals, in the case of Missouri Gas & Electric Service Company v. Rea & Page Milling Company. In the circuit court the service company had judgment against the milling company upon the cause of action stated in its petition and also had judgment upon the counterclaim of the latter.

The milling company appealed, and respondents reversed the judgment and remanded the cause with directions to the circuit court to enter judgment for the milling company upon its counterclaim. The propriety of the judgment for the service company upon its petition was not challenged in the Court of Appeals. It is contended that the opinion of respondents in respect to the counterclaim is in conflict with certain designated decisions of this court.

We cannot refrain from suggesting that relator has gone to much unnecessary and unjustifiable expense in Abstract. printing in this court what appears to be the entire record which was before the Court of Appeals. The only part of the record which we can properly consider in this proceeding is that pertaining to the question of conflict of opinion. Our Rule 34 provides for the filing of a petition of not exceeding five pages, in which shall be set out the issue presented to the Court of Appeals and which shall show wherein and in what manner the alleged conflicting ruling arose and the precise place in our official reports where the controlling decision will be found. Said rule also provides what such petition shall contain. It is apparent that the record in such *certiorari* proceeding should begin with the filing of the petition for our writ of *certiorari* and should embody such petition and exhibits accompanying same, together with subsequent proceedings in this court.

The sufficiency of relator's abstract has not been challenged by respondents and we do not mean to hold that it does not include everything essential to a fair and proper presentation of the question of conflict. Our suggestion is that such record contains too much.

We will briefly state the facts, as they appear in the opinion of respondents. The service company was operating a plant at Marshall, Missouri, for the production of electricity for light and power purposes. The milling company was operating a flour mill in the same city. The service company convinced the milling company that a saving in operating costs could be effected

by installing electric motors to replace steam as motive power in its mill and, in April, 1915, the two companies entered into a contract in relation to such installation. A contract, to become effective May 16, 1915, was exe- cuted, covering rates and charges for furnishing such electric current. The latter contract was filed with the Public Service Commission, together with the schedule of wholesale rates in conformity therewith. Such con- tract, so filed with the commission, contained the follow- ing provision in relation to the method of determining the maximum demand.

"The maximum demand shall be estimated as fol- lows:  55 per cent of the total equivalent rated horse- power motors and lights and other apparatus connected. The company may, if it desires, measure the company's maximum demand, in which case the maximum demand in any month shall be the average number of kilowatts indicated or recorded in the 30-minute intervals in which the consumption of electricity is greater than in any other 30-minute interval in the month."

The schedule of rates on file with the commission, provided for a demand charge of $2.25 per month per kilowatt for the first 50 kilowatts of maximum demand per month and for $2 per kilowatt per month for the ex- cess of the maximum demand over 50 kilowatts.  One motor of 150 horse-power and another of 20 horse-power were installed.  The two motors were equivalent to 127 kilowatts.  Fifty-five per cent of 127 kilowatts, together with lights and other apparatus connected, equaled 71 kilowatts, indicating a monthly demand charge of $154.50. This was the demand charge asked by the service com- pany and collected from the milling company for nearly three years.

We now quote from the opinion of respondents:

"On July 1, 1918, plaintiff, without notice to defend- ant and without any action by the Public Service Com- mission modifying the contract and schedule filed with them in 1915, changed the method of fixing their demand charge and rendered to defendant a statement for the

month of June, 1918, based on a demand charge of 86 kilowatts, or $184.50, and a monthly demand similar in amount was made thereafter until February 28, 1921.

"Testimony of defendant is to the effect that the $30 increase per month was paid under protest for a period of thirty-three months, from June 1, 1918, to February 28, 1921, or a total of $990."

It is the sum of $990, thus said to have been paid under protest for thirty-three months, which formed the basis of the counterclaim filed by the milling company, and which respondents held should have been allowed by the trial court. There are other matters touched upon in the opinion of respondents which do not involve matters in issue in this proceeding and as to which no complaint is made of any conflict with our decisions. The opinion of respondents then proceeded as follows:

"We are of the opinion entertained by the trial court that the only question in this case for our determination is whether or not plaintiff had the right to increase the demand charge as it did to the extent of $30 per month. As we read the record, defendant is making no contention as to the rate subsequent to the order of the Public Service Commission of March 4, 1921, nor as to the extra charge under the coal clause, so that these two items are out of the case.

"It is first urged that, having contracted to furnish electricity on the demand charge basis of 71 kilowatts, plaintiff was without authority, in the absence of an order of permission from the Commission and without a resurvey as per contract and statutory notice, to charge for 86 kilowatts, and it is upon this question the defendant bases its appeal. The contract between the parties specifies the method by which the utility company may make measurements to fix the demand charge, and defendant alleges that no such measurements ever were made, and therefore that plaintiff was without right to increase the demand charge. The only testimony on this point was that of W. G. Rea of defendant company, whose testimony was that no measurements

ever were made as a basis for the change in the service charge and that so far as he knew, no one attempted such measurements.; that he was not versed in the manner of making such masurements and would not know if it were being done had anyone attempted to make them.  No other testimony an this point was offered by either party.

"In this connection, plaintiff insists that as the only question at issue in this case is whether or not the counterclaim of $990 is just, the burden is on the defendant to prove the extra charge unjust.

"Section 10478, Revised Statutes 1919, par. 12, provides as follows: '. . . no change shall be made in any rate or charge, or in any form of contract or agreement, or any rule or regulation relating to any rate, charge or service, or in any general privilege or facility which shall have been filed and published by a gas corporation, electrical corporation, water corporation or municipality in compliance with an order or decision, except after thirty days' notice to the commission. . . . No corporation or municipality shall charge, demand, collect or receive a greater or less or different compensation for any service rendered or to be rendered than the rates and charges applicable to such services as specified in its schedule filed and in effect at the time. . . . '

"There is no dispute that at the time plaintiff increased the demand charge against defendant from 71 to 86 kilowatts there was not on file with the Public Service Commission a request for, or order of the Public Service Commission relative to such change.  Nor was there any agreement between the parties, or schedule on file with said Commission other than the contract and schedule filed May 15, 1915, and that schedule provided for a demand charge of 71 kilowatts.  It must be held, therefore, under this statute, that plaintiff was without authority to increase the demand charge without an order of the Public Service Commission, after notice to defendant.  Plaintiff does not contend that such an order was procured.  So far as the evidence shows, defendant had

no notice of the increase until it received a bill for the month of June, 1918, which embraced the increased demand charge.

"The schedule of rates filed with the Public Service Commission contains this clause: 'The company may, if it desires, measure the customer's maximum demand, in which case, the maximum demand in any month shall be the average number of kilowatts indicated or recorded in the 30-minute intervals in which the consumption of electricity is greater than in any other thirty-minute intervals in the month.'

"We accept defendant's theory that the effect of this clause was merely to give plaintiff the right to contract with defendant to measure the electricity consumed, but plaintiff did not so contract; therefore the method of determining the demand charge reverts back to the terms of the contract, to-wit, the rated horse-power of motors, lights and apparatus connected therewith."

I. The first alleged conflict suggested appears in the holding of respondents that the effect of the clause relative to the method of measuring the demand charge was merely to give the service company the *right to contract* with the milling company to *measure* the maximum demand. This ruling is said to be in conflict with State ex rel. Sedalia v. Public Service Commission, 275 Mo. 201; Fulton v. Public Service Commission, 275 Mo. 67; Kansas City Bolt & Nut Co. v. Kansas City Power & Light Co., 275 Mo. 529, and Water Co. v. Sedalia, 288 Mo. 411.

In State ex rel. Sedalia v. Public Service Commission, supra, it was held that the fixing of rates for service to be rendered by public utilities is an exercise of the police power of the State and that the commission has the right and the power to fix reasonable rates irrespective of existing contracts between such utility and the city. Speaking of the police power of the State, it was there said: "Under it no contract as to rates will stand as against the order of the Public Service Com-

mission for reasonable rates, whether such reasonable rates be lower or higher than the contract rate." And again, it was said: "Its rates therefore constitutionally and legally supersede any and all contract rates."

All rates and charges fixed by the Public Service Commission are deemed to be reasonable until the order fixing same be set aside in an appropriate proceeding. When the service company filed with the commission its contract and schedule fixing rates for service and charges for maximum demand, such rates and charges became effective under the provisions of the statute and were binding upon the service company and the milling company, irrespective of any private contract between them. It is true that the contract arrangement for assessing the demand charge at 55 per cent of the total equivalent rated horse-power motors and lights and other apparatus connected was one of the provisions for determining such demand charge. An optional method was provided for which was an actual measurement under certain designated conditions. It was optional with the service company whether it would continue to base the demand charge upon the agreed, but arbitrary, basis of 55 per cent of the equivalent rated horse-power or would actually measure the maximum demand. The milling company could no more require the service company to secure its consent to the ascertainment of such maximum demand charge by actual measurement, through a new contract, than it could have successfully interposed its contract for assessment of the demand charge at 55 per cent of the equivalent rated horse-power, etc., against a specific order of the commission that such demand charge be ascertained by actual measurement. To assert the right to have a new contract made is to deny the right of the commission to fix reasonable rates and charges regardless of existing contracts.

The opinion of respondents that the clause giving the service company the right to measure the maximum demand, merely gave it the *right to contract* with the milling company thus to measure such maximum de-

mand, therefore conflicts with State ex rel. Sedalia v. Public Service Commission, supra. The service company had the right thus to measure the maximum demand, independent of the consent of the milling company. No order of the commission was necessary, because the schedule of the service company already on file with the commission authorized it to measure the maximum demand and to charge therefor on that basis.

The other cases relied upon by relator merely follow and approve State ex rel. Sedalia v. Public Service Commission. The opinion of respondents is thus brought into conflict with such decisions also.

II. Respondents' holding that the service company was without authority to increase the demand charge without an order of the Public Service Commission, after notice to the milling company, is also assailed as conflicting with decisions of this court, as well as with paragraph 12, Section 10478, Revised Statutes 1919. We have already quoted what respondents said upon this point, including their quotation of said paragraph and section of the statute. It is no ground for quashing the opinion of the court of Appeals that such court may have failed to construe a statute correctly. We cannot do this unless such construction conflicts with some prior decision of this court construing that particular statute or unless such opinion announces rules for construing statutes generally which are in conflict with general rules laid down by this court.

A court of appeals is a court of last resort, when acting within its jurisdiction. Its opinion may only be quashed when it exceeds its jurisdiction by rendering a decision in conflict with the last controlling decision of this court, which it is constitutionally bound to follow. Therefore, a court of appeals has the same power to construe a statute authoritatively, as a matter of first impression, as this court has. In such case, its opinion cannot be quashed, even if deemed by this court to be incorrect.

In its petition for our writ relator cited no decision from this court with which this portion of respondents' opinion is said to conflict.  However, in its brief, relator refers us to the case of Marty v. Kansas City Light & Power Co., 259 S. W. 793, and particularly a quotation from page 795.  That case cannot be said to deal in any way with the necessity of notice to a consumer, when a public utility seeks to make some change in its schedule of rates and charges.  It should be suggested, however, that the question of notice, even to the commission, is of no importance and such notice to the consumer or any one else entirely unnecessary, if the service company, in measuring the actual maximum demand, was merely exercising an option it had under the schedule of rates and charges already on file with the commission.  Such measurement and charges based thereon constituted no change in its schedule of rates and charges.  It merely constituted the exercise of the option to change the method of arriving at such charges.  The schedule made no provision for notice to the milling company before such option could be exercised.

III.   Yet another conflict between respondents' opinion and controlling decisions of this court is urged by relator.  It relates to the holding of respondents in respect to the sufficiency of the proof that no measurement of the maximum demand was in fact made by the service company.  Respondents correctly held that the burden of proof on the point was on the defendant.  As this is a law case, if the evidence tended to show that such maximum demand was not actually measured and the trial court had so found, an appellate court would not disturb the finding of the trial court upon the point.  On this point respondents said that "defendant's testimony tends to show that no such survey was made," etc.  To support this conclusion respondents quoted the testimony of William G. Rea and stated their conclusions therefrom as follows:

*Proof of Demand.*

" 'Q. I will ask you, Mr. Rea, if in any month after June 1, 1918, measurements were taken of your mill of the amount of electricity being used under this demand charge. A. No.'

"An objection made by plaintiff was overruled by the court.

" 'Now, Mr. Rea, did they come there and make a measurement each month, any of the employees or officials of the company, of your electricity that was being used?'

"Plaintiff's objection to this question was overruled by the court. The answer was, 'No.'

" 'Q. Did you ever know of them to make any measurements at all? A. No, sir.'

"On cross-examination on this point witness Rea stated that he personally did not know how to measure the maximum demand; that he would not know whether anyone was measuring the maximum demand had anyone been there; he would not know what they were doing because he did not know the method. However, on direct examination, he stated that no one was at the mill at any time for that purpose, to his knowledge.

"By this testimony we think defendant successfully met the requirement of burden of proof and being unrefuted, said testimony established the illegality of the excess demand charge collected."

This ruling is alleged to be in conflict with Childers v. Pickenpaugh, 219 Mo. 376, l. c. 435, 436, and Rothwell v. Jamison, 147 Mo. 601, l. c. 608 to 610. In the Childers case, hearsay testimony was rejected as carrying no weight or probative force. In the Rothwell case testimony of witnesses likewise based upon hearsay was disregarded when it appeared that they had no personal knowledge of the matters concerning which they undertook to testify.

We think the holding, that the testimony of witness Rea tended to show that no measurement was taken, conflicts with the reasoning which controlled our estimate of the hearsay testimony in those cases, although

those cases were not dealing with the *rules* governing testimony, given as of the personal knowledge of the witness, shown upon cross-examination not to have been based upon such knowledge. It may be the correct rule that, when a witness testifies to a fact upon his direct examination and then upon cross-examination makes admissions which show that his testimony, given upon direct examination, was not based upon his knowledge of the facts, such direct testimony has no probative force whatever. However, we do not believe the cases relied upon laid down any such sufficiently definite *rule upon the subject* that we can say respondents' holding is in conflict therewith.

But whatever may be thought of the actual conflict engendered by the holding that this evidence *tended* to show that no such measurement was made, we have no doubt whatever that the holding of respondents that such testimony, when not refuted, *established* the illegality of the demand charge collected, in the absence of a finding on the issue by the trier of the facts, conflicts with controlling decisions of this court.

Appellate Practice.

The weight and credit to be given to the testimony of any witness is for the trier of the facts—in this case the trial judge. It does not appear from respondents' opinion whether the trial judge took the view that there was no evidence that the maximum demand had not been measured or deemed the testimony of witness Rea on the point not to be convincing. If the trial judge took the latter view, his finding is conclusive upon an appellate court, for the trier of the facts has the right to disbelieve testimony, *even when it is not contradicted*. [Gannon v. Laclede Gas Light Co., 145 Mo. 502, l. c. 516; Union Trust Co. v. Hill, 283 Mo. 278, l. c. 282; State ex rel. Brewing Co. v. Ellison, 286 Mo. 225, l. c. 233; Unrein v. Okla. Hide Co., 295 Mo. 353, l. c. 368; Diehl v. Green Fire Brick Co., 299 Mo. 641, l. c. 660.]

If the trial judge took the view that there was no substantial testimony tending to show that the maximum

demand was not measured and the respondents held to the contrary, respondents had no right to usurp the function of the trier of the facts and make the finding they did make. The only thing which an appellate court may do under such circumstances is to reverse the judgment and remand the case to give the trier of the facts an opportunity to *weigh* the evidence.

It was evidently upon the theory that the testimony of witness Rea not only tended to, but did conclusively, establish the fact that the maximum demand was not measured, that respondents remanded the case to the circuit court with directions to enter judgment for the milling company on its counterclaim.

The holding of respondents that the testimony of witness Rea *established the fact that the maximum demand was not measured,* in the absence of a finding to that effect by the trier of the facts, conflicts with the Gannon case and other cases we have cited in that connection.

This conflict is not suggested by relator, but seems clear to us and, as its existence appears in the opinion, it is our duty to notice such conflict, notwithstanding relator has not urged it. [State ex rel. v. Ellison, 273 Mo. 218, 1. c. 228; State ex rel. v. Trimble, 300 Mo. 92, 1. c. 101.]

It is our conclusion that the record of the Court of Appeals should be quashed where conflict exists, as herein indicated, and it is so ordered. All concur.